UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SABBY VOLATILITY WARRANT
MASTER FUND LTD.,

                    Plaintiff,

          -v.-

JUPITER WELLNESS, INC.,

                    Defendant.

23 Civ. 7874 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Sabby Volatility Warrant Master Fund Ltd. ("Plaintiff" or "Sabby") brings the instant action against Defendant Jupiter Wellness, Inc. ("Defendant" or "Jupiter"), alleging that it suffered financial losses when Defendant failed to honor the record date it initially set for a planned issuance of a stock dividend in Jupiter's subsidiary, SRM Entertainment, Inc. ("SRM"). Specifically, Plaintiff asserts that: (i) as a shareholder in Jupiter on the initial record date for the SRM dividend, Plaintiff was entitled to receive a distribution of SRM shares; and (ii) because Plaintiff acted in reliance on Defendant's proffered record date, Plaintiff should be compensated for the losses it suffered as a result of its short position in Jupiter's stock when the record date was changed. Plaintiff's Amended Complaint advances several causes of action, including breach of contract, promissory estoppel, negligent misrepresentation, and negligence.

Defendant has moved to dismiss Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth in the remainder of this Opinion, the Court grants Defendant's motion to dismiss.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff Sabby is a limited liability company and private equity fund, formed under the laws of the Cayman Islands, with its principal place of business in George Town, Cayman Islands.  (AC ¶ 4).  Defendant Jupiter, a Delaware corporation, supports health and wellness by researching and developing over-the-counter products and intellectual property.  (*Id.* ¶ 5). Defendant is publicly traded on the NASDAQ stock exchange, with its principal place of business in Jupiter, Florida.  (*Id.*).  Effective September 15, 2023, Defendant changed its name to Safety Shot, Inc.  (*Id.*).

#### 2.    The Announcement of the Dividend

On May 26, 2023, Defendant entered into an agreement with its subsidiary, SRM, that governed the separation of SRM's business from Defendant.  (AC ¶ 10).  About a month later, on June 27, 2023, Defendant's board of directors (the "Board") determined that Defendant would issue a distribution of shares of SRM common stock to Defendant's shareholders (the

---

[1]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #22)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Kari Parks ("Parks Decl., Ex. [ ]" (Dkt. #25)), each of which is incorporated by reference in the Amended Complaint.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. # 24); to Plaintiff's memorandum of law in opposition as "Pl. Opp." (Dkt. #28); and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #29).

"SRM Dividend").  (*Id.* ¶ 11).  The Board initially set the record date for the distribution of 2,000,000 shares of SRM's common stock as July 7, 2023.  (*Id.*).  On the same day as the Board's decision, a press release announcing the distribution of SRM stock, as well as the record date for the distribution, was released to the public (the "June 27 Press Release").  (*Id.* ¶¶ 11-12).  The June 27 Press Release stated in relevant part:

> Jupiter Wellness, Inc. …, today announced that the record date for the spin-off and distribution of shares of common stock, par value $0.0001 per share, ("SRM Common Stock"), of SRM Entertainment, Inc. ("SRM"), currently a majority-owned subsidiary of the Company, has been set for July 7, 2023 (the "Record Date").

(Parks Decl., Ex. A).  The June 27 Press Release went on to state that the "distribution [wa]s expected to [be] paid on or about July 12, 2023."  (*Id.*).

As potentially relevant to the instant motion, the June 27 Press Release contained several qualifiers.  For example, the press release noted that if the "Registration Statement [wa]s not declared effect[ive] or the SRM Common Stock [wa]s not approved for listing, the distribution w[ould] not be paid on such date and the spin-off transaction w[ould] not occur."  (Parks Decl., Ex. A).  Significantly, the document also contained a section entitled "Forward-Looking Statements," which warned that "risks and uncertainties … may cause actual results and the timing of events to differ materially from those anticipated."  (*Id.*).  Further, "[i]nvestors [we]re cautioned that forward-looking statements are not guarantees of future performance."  (*Id.*).  Several factors were listed as potential inhibitors to the successful issuance of the dividend, including "the

expected benefits and costs of the intended spin-off transaction, the expected timing of the completion of the spin-off transaction[,] and the transaction terms."  (*Id.*).

In the weeks following the June 27 Press Release, Defendant repeatedly delayed the distribution date of the SRM Dividend.  (AC ¶ 14).  These delays were announced in multiple press releases, issued in July and August of 2023.  (*Id.* ¶ 15).[2]  While these press releases advised of the change in the distribution date, they continued to recite that the record date for the dividend would remain the same, July 7, 2023.  (*Id.*).

In addition to issuing press releases during this period, Defendant released filings through SRM, in the form of draft registration statements.  (AC ¶ 17).  SRM's draft registration statement, amended on July 6, 2023, advised that shareholders of Defendant would receive a "distribution of one share of [SRM] stock" and that the "record date [would be] the close of business, New York City time, on July 7, 2023."  (*Id.* ¶¶ 17-18).  Subsequent drafts of the SRM registration statement were issued on July 18, 2023, and July 28, 2023, containing the same disclosure.  (*Id.* ¶ 20).

---

[2]    There is a dispute between the parties as to the exact dates in which Defendant issued press releases on the SRM Dividend.  Plaintiff represents that, in addition to the initial press release issued on June 27, 2023, Defendant issued press releases on July 11, 2023, July 21, 2023, and August 3, 2023.  (*See* AC ¶ 15).  Defendant contends that it did not issue any press releases on July 21, 2023.  (*See* Def. Br. 4).  At this stage, the Court accepts the allegations as pleaded in the Amended Complaint as true.  *See Caro* v. *Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010) ("We review the dismissal of a complaint *de novo*, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff.").

Defendant ultimately issued the SRM Dividend on or about August 15, 2023. (AC ¶ 16). However, despite Defendant's prior statements, the record date for the SRM Dividend was ultimately set for August 14, 2023. (*Id.*).

On August 21, 2023, Defendant filed a Form 8-K with the Securities and Exchange Commission (the "SEC"). (AC ¶ 16). Somewhat contradictorily, the form stated:

> On August 14, 2023, the Company distributed 2,000,000 shares of Common Stock owned by the Company to its stockholders and holders of certain warrants based on the record date of *July 7, 2023*. Following the distribution, the Company is the largest shareholder of SRM, owning 4,500,000 shares of Common Stock.

(*Id.* (emphasis added)). Defendant also issued a final draft of the SRM Registration Statement, in the form of a prospectus, on August 18, 2023. (*Id.* ¶ 20). This prospectus was "in substantially the same form as the [draft] filed in June 2023." (*Id.*). Plaintiff asserts that the "sole reason for [Jupiter's] delay in the distribution of the SRM Dividend involved the timing of a public offering of shares by SRM." (*Id.* ¶ 21).

### 3. Sabby Sells and Shorts Jupiter's Stock

As of July 7, 2023, Plaintiff held 1,413,940 shares of Defendant's stock. (AC ¶ 13). Thus, had the record date for the SRM Dividend remained July 7, 2023, Plaintiff would have been entitled to approximately 73,072 shares of SRM common stock. (*Id.*). However, after July 7, 2023, but before August 14, 2023, in reliance on Defendant's public statements, Plaintiff sold its holdings in Jupiter common stock. (*Id.* ¶ 25). Because Plaintiff sold its shares of stock

prior to August 14, 2023, it did not receive any distribution from the SRM Dividend.  (*Id.* ¶ 24).

In addition to selling its shares of Jupiter stock, Plaintiff decided to accumulate a short position in Defendant's common stock after July 7, 2023, but before August 14, 2023.  (AC ¶¶ 3, 25).  Specifically, as of August 14, 2023, Plaintiff held a short position in Defendant of approximately 1,713,986 shares. (*Id.* ¶ 26).  Plaintiff alleges that the existence of its short position was "well known to Jupiter through public reports on NASDAQ."  (*Id.* ¶ 25).  This short position created a liability for Plaintiff when Defendant distributed the SRM Dividend to holders of its stock as of August 14, 2023, because Plaintiff received proportional shares of SRM stock short.  (*Id.* ¶¶ 26-27).  Ultimately, this left Plaintiff with the equivalent of 88,578 shares of SRM's stock short.  (*Id.* ¶ 27).

Because Plaintiff did not receive the SRM Dividend, Plaintiff alleges that it suffered damages estimated in excess of $300,000.  (AC ¶ 38).  What is more, in order to cover the liabilities created by its short position in Defendant's stock, Plaintiff was required to purchase SRM stock on the open market at a cost of approximately $350,000.  (*Id.* ¶ 27).  Thus, Plaintiff alleges that it suffered economic injuries as a result of Defendant's conduct "estimated to exceed $500,000."  (*Id.* ¶¶ 47, 55).

## B.    Procedural Background

Plaintiff initiated this action by filing a complaint on September 5, 2023. (Dkt. #1).  On November 10, 2023, after receiving an extension of the answer

6

deadline, Defendant filed a pre-motion letter expressing its intention to file a motion to dismiss on all counts of the Complaint (Dkt. #13), which motion Plaintiff opposed (Dkt. #16).  On November 28, 2023, the Court held a conference to discuss the issues raised by the parties' submissions.  (*See* November 28, 2023 Minute Entry).  The parties subsequently proposed a briefing schedule for amendment of the Complaint and for Defendant's motion to dismiss, which schedule the Court promptly endorsed.  (Dkt. #21).

Plaintiff's Amended Complaint, the operative pleading in this matter, was filed on December 15, 2023.  (Dkt. #22).  Defendant filed its motion to dismiss papers on January 5, 2024 (Dkt. #23-25), and Plaintiff filed its opposition to Defendant's motion on February 2, 2024 (Dkt. #28).  Finally, Defendant filed its reply in further support of its motion to dismiss on February 16, 2024.  (Dkt. #29).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Challenges to a party's standing are properly brought pursuant to

Federal Rule of Civil Procedure 12(b)(1).  *See generally Gillett* v. *Zara USA, Inc.*, No. 20 Civ. 3734 (KPF), 2022 WL 3285275, at *4 (S.D.N.Y. Aug. 10, 2022).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions.  *See Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).  A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  *Id.* at 56.  A plaintiff opposing such motion bears "no evidentiary burden."  *Id.*  Rather, to resolve a facial Rule 12(b)(1) motion, the district court will "determine whether [the complaint and its exhibits] allege[] facts that" establish subject matter jurisdiction.  *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  To make that determination, a court must accept the complaint's allegations as true and "draw[] all reasonable inferences in favor of the plaintiff."  *Id.* at 57 (internal quotation marks and citations omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [complaint and its exhibits]."  *Carter*, 822 F.3d at 57.  "In opposition to such a motion, plaintiff[] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing."  *Katz* v. *Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017) (internal quotation marks and citation omitted).  If a defendant supports his

fact-based Rule 12(b)(1) motion with "material and controverted" extrinsic evidence, a "district court will need to make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57.

### 2. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Defendant also seeks to dismiss the Amended Complaint pursuant to Rule 12(b)(6). When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [p]laintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotations marks omitted) (citing *Twombly*, 550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks and citations omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is

inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## B.    Analysis

Plaintiff's Amended Complaint asserts four causes of action against Defendant, including: (i) breach of contract, (ii) promissory estoppel, (iii) negligent misrepresentation, and (iv) negligence.  In moving to dismiss, Defendant first argues that Plaintiff does not have standing to bring these claims because Plaintiff sold all of its shares of Jupiter stock prior to the issuance of the SRM Dividend.  Second, and in the alternative, Defendant argues that each of Plaintiff's claims fails on the merits.

As set forth below, Defendant's standing argument has only limited success, resulting in the Court's dismissal of Plaintiff's claim for breach of contract.  Nevertheless, the Court ultimately grants Defendant's Rule 12(b)(6) motion in full, finding that Plaintiff fails to plausibly allege any of the remaining causes of action.

### 1.    Plaintiff's Claims Are Substantively Governed by Delaware Law

Before evaluating the merits of Plaintiff's claims, the Court considers which state's law must be applied when doing so.  Because jurisdiction in this

matter is premised on diversity of citizenship (AC ¶ 6), the Court applies New York choice-of-law rules.  *See Fieger* v. *Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law.").  Under New York choice-of-law rules, the "first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co.* v. *Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (citing *Fieger*, 251 F.3d at 393).  "If not, no choice of law analysis is necessary." *Id.*  Further, "where the parties agree that [a state's] law controls, this is sufficient to establish choice of law."  *Id.*

Plaintiff argues that to the extent a conflict of law arises, Delaware law controls because Delaware "has the strongest ties to the parties and the strongest interest in enforcing the rights of shareholders in corporations formed under its laws." (*See* Pl. Opp. 5-6).[3]  Defendant does not provide a choice-of-law analysis, but does not dispute Plaintiff's assertion and predominantly relies on Delaware law.  (*See generally* Def. Br.; Def. Reply). Because both parties are seemingly in agreement that Delaware law governs,

---

[3]   Plaintiff alleges in its Amended Complaint that the action is governed by the "internal affairs doctrine." (AC ¶ 7).  The internal affairs doctrine is a "conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs."  *Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302 cmt. b. (1971)).  Because the parties do not dispute that Delaware law applies, the Court does not conduct an independent analysis to determine whether the internal affairs doctrine is in fact applicable.  Even if the internal affairs doctrine were to apply, however, Delaware law would still govern because it is the "law of the state of incorporation." *Marino* v. *Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) (explaining that, under New York choice-of-law rules, when the internal affairs doctrine applies, the "law of the state of incorporation [governs] such claims").

the Court will apply Delaware law for the purpose of this motion. *See Ins. Co. of the State of Pa.* v. *Equitas Ins. Ltd.*, 68 F.4th 774, 779 n.2 (2d Cir. 2023) (finding the court "need not undertake a complicated choice-of-law analysis" when the "parties agree that [a certain jurisdiction's] law controls" (quoting *Alphonse Hotel Corp.* v. *Tran*, 828 F.3d 146, 152 (2d Cir. 2016)); *see also Krumme* v. *Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (explaining that the parties' "implied consent … is sufficient to establish choice of law").

### 2. The Court Dismisses Plaintiff's Breach of Contract Claim for Lack of Standing

As an initial matter, Defendant argues that Plaintiff has no standing to bring any of its claims because Plaintiff sold its shares of Jupiter stock prior to the issuance of the SRM Dividend. (Def. Br. 9-11.) As a result, Defendant asserts, the "property rights associated with [Plaintiff's] shares," including the right to sue, were transferred to the new shareholders. (*Id.* (quoting *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015), *as revised* (May 21, 2015), *judgment entered sub nom. In re Activision Blizzard, Inc. Stockholder Litig.*, Civ. Action No. 8885-VCL, 2015 WL 2415559 (Del. Ch. May 20, 2015)).)

To determine whether a former shareholder has standing to assert a claim against a corporation, a court must ask whether the alleged injuries are personal in nature, by virtue of a wrong committed against the plaintiff personally, or whether they are dependent on the relationship between and among the stockholder, the stock, and the company. *Urdan* v. *WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020); *see also Citigroup Inc.* v. *AHW*

*Inv. P'ship*, 140 A.3d 1125, 1127 (Del. 2016) (concluding that standing rests on whether plaintiff "seek[s] to bring a claim belonging to her personally or one belonging to the corporation itself").  Thus, Delaware law recognizes certain direct claims that belong to shareholders personally; these "personal claims" are retained by former shareholders and, as such, do not travel with the sale of a security.  (Pl. Opp. 7 (quoting *Activision*, 124 A.3d at 1057)).  *See also Urdan*, 244 A.3d at 677 ("[P]ersonal claims do not depend on the relationship between the stockholder and the corporation or the existence of an underlying security.").  Applying this standard to each of Plaintiff's claims, the Court finds that Plaintiff has standing to bring all but one of them.

### a.    Plaintiff Lacks Standing to Bring a Breach of Contract Claim Based on Defendant's Bylaws

Plaintiff's first cause of action asserts a claim for breach of contract based on the terms of Defendant's bylaws.  (AC ¶¶ 33-38).  Section 6.9 of Defendant's bylaws mandated that it provide "holders as of the record date — and not transferees after that time" with "any declared dividend."  (*Id.* ¶ 2).  Thus, according to Plaintiff, when Defendant failed to issue the dividend to holders of the stock as of the record date, it breached this "contract between the corporation and its stockholders."  (*Id.* ¶ 34).[4]

---

[4]    Defendant asserts that it is not even a party to its own bylaws because the bylaws constitute a contract between a company's "directors, officers and shareholders" — of which Defendant, as the corporation, is not a part.  (Def. Br. 11-12).  This assertion stands in contrast to established Delaware law, as courts routinely permit suits against corporations for breach of contract claims based on a corporation's bylaws.  *See, e.g.*, *Boilermakers Loc. 154 Ret. Fund* v. *Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch.), *judgment entered sub nom. Boilermakers Loc. 154 Ret. Fund & Key W. Police & Fire Pension Fund* v. *Chevron Corp.* (Del. Ch. 2013) ("In an unbroken line of decisions dating back several generations, [Delaware's] Supreme Court has made clear that the bylaws constitute a

Under Delaware law, however, breach of contract claims that are premised on a corporation's bylaws are considered to be related to the attributes of the stock itself.  *See FDIC* v. *Citibank N.A.*, No. 15 Civ. 6560 (ALC), 2016 WL 8737356, at *5 (S.D.N.Y. Sept. 30, 2016) (noting that the "right to enforce corporate bylaws or charters" is a "corporate right" under Delaware law, as opposed to a personal claim); *cf. Urdan*, 244 A.3d at 677 ("A corporate charter violation claim travels with a stock sale because the injury 'is to the stock and not the holder.'" (quoting *Schultz* v. *Ginsburg*, 965 A.2d 661, 667 (Del. 2009))).  This conclusion follows from the proposition that bylaws, along with certificates of incorporation and similar documents, constitute a multi-party contract between and among a corporation and its directors, officers, and shareholders.  *See Activision*, 124 A.3d at 1050 ("[T]he DGCL, the certification of incorporation, and the bylaws together constitute a multi-party contract…. As parties to the contract, stockholders can enforce it.").  As such, the rights associated with these documents "arise out of the relationship between the stockholder and the officers and/or corporation," and are not the type of "the claims and rights [that] travel with the shares."  *FDIC*, 2016 WL 8737356, at *5.  Because a breach of contract claim based on a corporation's bylaws results in an injury to the stock, these claims are not personal and cannot be asserted by former shareholders.

---

binding part of the contract between a Delaware corporation and its stockholders."); *accord Airgas, Inc.* v. *Air Prod. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders; therefore, [the] rules of contract interpretation apply.").  As such, the Court's analysis assumes a contractual relationship between Defendant, as a corporation, and its shareholders.

Here, Plaintiff's breach of contract claim is based on an alleged breach by Defendant of Section 6.9 of its bylaws. Defendant's bylaws are a "contract[] that govern[s] every aspect of the security holder's right," thus indicating a close relationship between its stock and the claim Plaintiff has asserted. *FDIC*, 2016 WL 8737356, at *4-5 (dismissing a breach of contract claim for lack of standing when premised on a document "akin to a company's bylaws" because "former holders have no standing to enforce the securities or their governing agreements"). Accordingly, the Court concludes that Plaintiff lost standing to pursue this claim when it sold its shares of Jupiter stock and, thus, will dismiss Plaintiff's breach of contract claim for lack of standing.[5]

---

[5]    In their briefs, the parties argue for the first time over whether the SRM Dividend may have been a "property dividend" akin to a "cash dividend." (Pl. Opp. 2.) As Defendant explains, "when Delaware corporations declare a cash [or property] dividend, they create a binding contract to pay the dividend to holders as of the dividend's record date." (Def. Br. 17 (citing *Caleb & Co.* v. *E.I. DuPont de Nemours & Co.*, 615 F. Supp. 96, 106 (S.D.N.Y. 1995))). Plaintiff argues that this type of dividend is distinguishable from a stock dividend, which does not create such a contractual right. (Pl. Opp. 13.)

Plaintiff's Amended Complaint did not raise the argument that the SRM Dividend was a property dividend as a basis for its breach of contract claim. (*See generally* AC). Instead, in support of its claims, Plaintiff cites only to Defendant's bylaws. (*Id.* ¶¶ 32-38 (alleging "Defendant has breached the bylaws")). It is well established that a plaintiff cannot amend its complaint or raise new claims in its opposition to a motion to dismiss. *See Town and Country Adult Living, Inc.* v. *Village/Town of Mt. Kisco,* No. 17 Civ. 8586 (CS), 2019 WL 1368560, at *14 (S.D.N.Y. Mar. 26, 2019) ("It is well established that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Even assuming, *arguendo*, that Plaintiff had brought a claim for breach of contract under this theory, the claim would still be dismissed. The dividend here is properly classified as a "spin-off dividend." *IDT Corp.* v. *U.S. Specialty Ins. Co.*, Civ. Action No. N18C-03-032, 2019 WL 413692, at *13 (Del. Super. Ct. Jan. 31, 2019) (explaining a spin-off dividend is when "a parent corporation distributes ... shares of one of its wholly-owned subsidiary corporations to its existing stockholders"). Under Delaware law, a spin-off dividend is distinguishable from a stock or property dividend. *See In re IAC/InterActive Corp.*, 948 A.2d 471, 511 (Del. Ch. 2008) (stating "[t]he proposed spin-off [wa]s not a stock dividend" or a "distribution of stock in [the parent company] that would otherwise be paid as a cash dividend"). As such, Delaware courts have found that a party has no contractual right to a spin-off dividend based on a corporation's declaration of its intention to issue such a dividend. *See Anadarko Petroleum Corp.* v. *Panhandle E. Corp.*, 545 A.2d 1171, 1175 (Del. 1988) (rejecting the argument that

### b. Plaintiff Has Standing to Pursue the Remainder of Its Claims

The remainder of Plaintiff's claims are state-law equitable and tort claims challenging the manner in which Defendant issued the SRM Dividend. (*See, e.g.*, AC ¶¶ 41, 49-54, 57). In general, these claims allege that Plaintiff was individually harmed because of the allegedly false representations made in Defendant's press releases and other public filings. (*Id.*).

Under Delaware law, "[q]uintessential examples of personal claims ... include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares." *Activision*, 124 A.3d at 1056. As the Delaware Supreme Court has explained, "[n]o one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of the property." *Cede & Co.* v. *Technicolor, Inc.*, 542 A.2d 1182, 1188 (Del. 1988) (finding a former shareholder could assert a "private cause of action premised upon a claim of unfair dealing, illegality, or fraud"); *see also Oliver* v. *Boston Univ.*, Civ. Action No. 16570, 2000 WL 1091480, at *6 (Del. Ch. July 18, 2000) (concluding that plaintiff can maintain a claim if "they suffered special injury not suffered by all the stockholders generally" (internal citations and quotation marks omitted)).

---

plaintiff's "stockholders of record had a vested contractual right to the [spin-off] dividend"); *Barsky* v. *Flaherty*, Civ. Action No. 9132, 1987 WL 33981, at *7 (Del. Ch. Dec. 30, 1987) (finding that a resolution authorizing a spin-off was not a "contractually enforceable dividend" because "its conditions precedent have not yet been satisfied").

Plaintiff's claims for promissory estoppel, negligent misrepresentation, and negligence, like those for fraud, "require [Plaintiff to plead] facts specific to the person, like reliance, regardless of the underlying property." *In re AMC Ent. Holdings, Inc. S'holder Litig.*, 299 A.3d 501, 532 (Del. Ch. 2023). Unlike Plaintiff's claim based upon Defendant's bylaws, these causes of action are personal because, while "[t]he property happens to be shares, … the cause of action is not a property right carried by the shares." *Activision*, 124 A.3d at 1056. The injuries are particular to Plaintiff, resulting from the violation of a duty that Plaintiff claims it was independently owed. Accordingly, the Court finds that Plaintiff has standing to pursue its claims for promissory estoppel, negligent misrepresentation, and negligence.

### 3. The Court Dismisses Plaintiff's Remaining Claims on the Merits

#### a. The Court Dismisses Plaintiff's Claim for Promissory Estoppel

Proceeding to consider the merits of Plaintiff's claims, the Court begins with Plaintiff's claim for promissory estoppel, which claim alleges that "[t]hrough its public statements, Defendant made multiple unambiguous promises to its stockholders that it would issue a dividend to holders as of the record date of July 7, 2023." (AC ¶ 41). To state a claim for promissory estoppel under Delaware law, a party must show:

> (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding

because injustice can be avoided only by enforcement
of the promise.

*Chrysler Corp. (Del.)* v. *Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del.
2003) (quoting *Lord* v. *Souder*, 748 A.2d 393, 399 (Del. 2000)).  The promise
underlying a claim of promissory estoppel "must be a real promise — mere
expressions of expectation, opinion, or assumption are insufficient." *Territory
of U.S. Virgin Islands* v. *Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch.
2007), *aff'd,* 956 A.2d 32 (Del. 2008).  In other words, the promise must be
"reasonably definite and certain." *Id.*

Beginning with the first element of this standard, the parties disagree as
to whether the public documents issued by Defendant, including the various
press releases (AC ¶¶ 13, 15), created a binding promise.  (*Compare* Def.
Br. 19-21, *with* Pl. Opp. 17-20).  Under Delaware law, a promise is defined as
the "manifestation of an intention to act or refrain from acting in a specified
manner, conveyed in such a way that another is justified in understanding that
a commitment has been made." *Boulden* v. *Albiorix, Inc.*, Civ. Action No. 7051-
VCN, 2013 WL 396254, at *13 (Del. Ch. Jan. 31, 2013), *as revised* (Feb. 7,
2013) (internal citation omitted).  According to Plaintiff, "Defendant made
multiple unambiguous promises to its stockholders that it would issue a
dividend to holders as of the record date of July 7, 2023."  (AC ¶ 41; *see also*
Pl. Opp. 17).

The Court disagrees.  Plaintiff has failed to demonstrate that the
representations — made in documents directed at the general public — created
an enforceable promise as to Plaintiff.  *See VonFeldt* v. *Stifel Fin. Corp.*, 714

18

A.2d 79, 87 (Del. 1998) (upholding the Chancery Court's decision to reject a "promissory estoppel claim on the rationale that the statements in [defendant's] public filings d[id] not amount to a 'promise' on which [plaintiff] could rely"); *see also Goldman, Sachs & Co.*, 937 A.2d at 805 (finding that "[d]escriptive statements in disclosure statements do not amount to a promise" for purposes of promissory estoppel). Indicatively, Plaintiff has failed to cite any case in which public statements were deemed sufficient to permit a claim for promissory estoppel against a corporate defendant under Delaware law. (*See generally* Pl. Opp.). The cases it does cite are easily distinguishable.

Plaintiff cites *Unisuper Ltd.* v. *News Corp.* for the proposition that public announcements and SEC disclosures, when issued with the "intent and full expectation that investors would rely upon them," can support a promissory estoppel claim. (Pl. Br. 18 (citing *Unisuper Ltd.* v. *News Corp.*, Civ. Action No. 1699-N, 2005 WL 3529317, at *3, 8 (Del. Ch. Dec. 20, 2005))). However, while the Delaware Chancery Court did allow a promissory estoppel claim to proceed in that case, it did so because the operative complaint could be "read to allege that an oral promise was made during conversations" between the plaintiff and defendant. *Unisuper Ltd.,* 2005 WL 3529317, at *8. Such promises are of a different nature than that at issue here, where Plaintiff does not allege that any promise was made to Plaintiff *personally*, beyond statements made to the public at large.

Even if it could establish that a sufficiently definitive promise was made, Plaintiff would also have to establish that it reasonably relied on those

statements.  However, reliance is not reasonable when the statements at issue are merely expressing future intention.  *See Reeder* v. *Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. Super. 1979) (noting that "expressions of opinion, expectation[,] or assumption are insufficient" to produce an estoppel claim); *see also In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989) (rejecting a claim for promissory estoppel under Delaware law because "reliance upon a mere expression of future intention cannot be reasonable, because such expressions do not constitute a sufficiently definite promise" (internal quotation marks and citations omitted)).  The documents issued by Defendant warned shareholders that the SRM Dividend was based on Defendant's "current plans, objectives, estimates, expectations, and intentions and inherently involve[d] significant risk and uncertainties," and the June 27 Press Release cautioned that the "spin-off transaction [may] not occur."  (Parks Decl., Ex. A).  These disclaimers were sufficient to put Defendant on notice that material terms related to the SRM Dividend, including the record date, were subject to change.

In sum, because (i) no promise was made by Defendant's public statements and (ii) any reliance by Plaintiff was not reasonable, Plaintiff's claim for promissory estoppel is dismissed.

### b.    The Court Dismisses Plaintiff's Claim for Negligent Misrepresentation

Plaintiff also asserts a claim for negligent misrepresentation, alleging that it "reasonably relied" on Defendant's "incorrect" statements regarding the record date.  (AC ¶¶ 53-54).  Under Delaware law, a claim for negligent

misrepresentation requires a plaintiff to plead that: "[i] the defendant had a pecuniary duty to provide accurate information, [ii] the defendant supplied false information, [iii] the defendant failed to exercise reasonable care in obtaining or communicating the information, and [iv] the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information." *Steinman* v. *Levine*, Civ. Action No. 19107, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003). A claim for negligent misrepresentation is "essentially a species of fraud with a lesser state of mind requirement, but with the added element that the defendant must owe a pecuniary duty to the plaintiff." *In re CBS Corp. S'holder Class Action & Derivative Litig.*, Civ. Action No. 2020-0111-JRS, 2021 WL 268779, at *24 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021) (quoting *Vichi* v. *Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 822 (Del. Ch. 2014)); *see also Lyons Ins. Agency Inc.* v. *Wilson*, Civ. Action No. 2017-0092-SG, 2018 WL 481641, at *4 (Del. Ch. Jan. 19, 2018) (explaining that negligent misrepresentation "lies only if there is either: (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for a remedy that only equity can afford" (internal citation omitted)).

Defendant's arguments focus on the first prong of this standard. In particular, Defendant argues that Plaintiff fails to plead a claim because "general statements … directed to the general public" do not "implicate a class to which a special duty of care is owed." (Def. Br. 19 (internal citations omitted)). Defendant further maintains that the lack of a "special relationship"

21

defeats Plaintiff's claims both (i) as a shareholder in Defendant and (ii) as an investor who shorted Defendant's stock. (*Id.* at 22).

Defendant is correct that Delaware courts have long expressed skepticism that statements directed at the "public at large" could support a special duty of care. *See, e.g.*, *Brug* v. *Enstar Grp., Inc.*, 755 F. Supp. 1247, 1258 (D. Del. 1991) (dismissing a case where the disseminated documents included SEC filings and press releases because plaintiffs did not place themselves within a "limited group of persons for whose benefit and guidance the information [wa]s intended" (internal quotation marks omitted)). When the "only documents which plaintiff[] identif[ies] as containing the alleged misrepresentations are documents released to the public at large," there is generally no claim for negligent misrepresentation. *In re Delmarva Sec. Litig.*, 795 F. Supp. 1293, 1310 (D. Del. 1992) (applying Delaware law). This is true even when it is a shareholder plaintiff that claims reliance on the public statements. *See Vichi*, 85 A.3d at 822 (finding a shareholder plaintiff could not allege negligent misrepresentation because the alleged statements were "general public statements" and thus "it would not appear that [defendant] owed [plaintiff] a pecuniary duty as to those statements"); *see also Metro Commc'n Corp. BVI* v. *Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 163 (Del. Ch. 2004) (explaining that if the equitable fraud claim could proceed, "stockholders would be permitted to sue their fiduciaries for damages based on misleading statements where the defendant was, at most, ordinarily negligent in not knowing the facts that made those statements misleading").

Plaintiff's claim for negligent misrepresentation based on its shorting of Jupiter stock also falters, because here too Plaintiff has failed to plead a special relationship. Delaware law does not extend liability for negligent misrepresentation claims to the general investing public, in which capacity Plaintiff was acting when shorting the stock. Instead, courts applying Delaware law have routinely found the opposite, that no such special duty exists. These courts have reasoned that "[i]f any member of the public who might choose to invest in [a company's] stock were to qualify as part of a protected class, then the 'limited group' requirement would be meaningless.'" *In re Delmarva Sec. Litig.*, 794 F. Supp. at 1310 (quoting *Brug*, 755 F. Supp. at 1258) (applying Delaware law); *see also In re CBS Corp. S'holder Class Action & Derivative Litig.,* 2021 WL 268779, at *26 (noting that negligent misrepresentation claims have been "deemed suspect" by Delaware courts and dismissing a claim based on public filings because plaintiffs failed to plead particularized facts)*; Corp. Prop. Assocs. 14 Inc.* v. *CHR Holding Corp.*, Civ. Action No. 3231-VCS, 2008 WL 963048, at *9 (Del. Ch. Apr. 10, 2008) (explaining that the "pecuniary duty requirement" is intended to "shield those who gratuitously provide information from liability").

Plaintiff's reliance on *Glosser* v. *Cellcor Inc.*, Civ. Action No. 12725, 1994 WL 593929 (Del. Ch. Sept. 2, 1994), does not alter this Court's analysis. (Pl. Opp. 18). While the court in *Glosser* allowed the plaintiff's claim for negligent misrepresentation to proceed past summary judgment based on representations made in a prospectus, the court confirmed that "general

statements such as press releases or even 8K or 10K filings are directed at the general public and do not implicate a class to which a special duty of care is owed." *Glosser*, 1994 WL 593929, at *22. The *Glosser* court's analysis depended on a finding that a prospectus was "materially different" from other SEC filings and from press releases, such that a negligent misrepresentation claim could survive. *Id.* Notably, while the Amended Complaint does allege that a prospectus was issued here, that issuance occurred on August 18, 2023. (AC ¶ 20). Since the SRM Dividend was issued on August 15, 2023, Plaintiff could not have relied on this document when making its decision to short Defendant's stock. (*Id.* ¶ 16). Prior to the issuance of the SRM's prospectus, only "drafts of the SRM Registration Statement" were issued, and such drafts were subject to change. (*Id.* ¶ 20).

Even if Plaintiff could plausibly allege that a special relationship exists between a corporation and its shareholders — or, even less likely, between a corporation and those investors who short its stock — Plaintiff separately failed to allege justifiable reliance. *See supra* B.3.a; *see also FS Parallel Fund L.P.* v. *Ergen*, Civ. Action No. 19853, 2004 WL 3048751, at *4 (Del. Ch. Nov. 3, 2004), *aff'd,* 879 A.2d 602 (Del. 2005) (dismissing a claim for equitable fraud because of a failure of plaintiffs to plead that they "justifiably relied on [] press release[s]"). Since Defendant's press releases expressly recognized that the spin-off transaction might not occur and contained a disclaimer involving forward-looking statements, Plaintiff could not have reasonably relied on the

dividend payment occurring, much less it occurring on a particular record date. *FS Parallel Fund L.P.*, 2004 WL 3048751, at *4.[6]

Plaintiff's negligent misrepresentation claim thus has both legal and factual flaws. With respect to the former, Plaintiff can offer no support for its assertion that as a shareholder or purchaser of securities, including a buyer of a short position, it stood in a special relationship sufficient to impose liability upon Defendant for negligent misrepresentation under Delaware law. With respect to the latter, Plaintiff cannot plausibly allege facts demonstrating reasonable reliance on Defendant's statements. In consequence, Plaintiff's claim for negligent misrepresentation is dismissed.

### c. The Court Dismisses Plaintiff's Claim for Negligence

Lastly, Plaintiff brings a claim for negligence, alleging that Defendant did not use "reasonable care when distributing shares so that investors receive the shares to which they are entitled." (AC ¶ 57). According to Plaintiff, "[a]n issuer exercising reasonable care would have promptly alerted its transfer agent as well as Depository Trust Company and FINRA of the record date" to avoid the distribution of shares to the "wrong shareholders." (*Id.* ¶ 30; Pl. Opp. 24 (emphasis omitted)).

---

[6]   The Court observes as well that "it is ... questionable as to whether a false statement of a presently existing fact" was actually made in the documents in which Plaintiff allegedly relied upon. *FS Parallel Fund L.P.* v. *Ergen*, Civ. Action No. 19853, 2004 WL 3048751, at *4 (Del. Ch. Nov. 3, 2004), *aff'd,* 879 A.2d 602 (Del. 2005). However, because of the procedural posture of this motion requires the Court to "draw all inferences in favor of [P]laintiff," the Court will "not conclude at this time that a false statement was not made." *Id.*

To state a cause of action for negligence under Delaware law, a plaintiff must allege "[i] the defendant owed the plaintiff a duty of care; [ii] the defendant breached that duty; [iii] the plaintiff was injured; and [iv] the defendant's breach was the proximate cause of the plaintiff's injury." *Campbell* v. *DiSabatino*, 947 A.2d 1116, 1117 (Del. 2008).  Beginning with the first element, Plaintiff asserts that Defendant had a "fiduciary duty of care and candor to its shareholders." (Pl. Opp. 21).  Delaware law is clear, however, that corporations do not owe fiduciary duties to their stockholders.  *See A.W. Fin. Servs., S.A.* v. *Empire Res., Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009) ("Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders." (citing *Arnold* v. *Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996); *Alessi* v. *Beracha*, 849 A.2d 939, 950 (Del. Ch. 2004))).  Instead, fiduciary duties are owed to the stockholders and to the company itself by the directors and officers who are the actual actors on behalf of the company.  *See In re Orchard Enters., Inc. S'Holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014) ("The fiduciaries who serve the entity owe fiduciary duties; the entity that is served does not."); *Buttonwood Tree Value Partners, L.P.* v. *R.L Polk & Co.*, Civ. Action No. 9250-VCG, 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014) (explaining that "a corporation acts through its directors").  Unsurprisingly, Plaintiff does not cite to a single case in which a court applying Delaware law has found that a corporation, as distinguished from the corporation's board or its directors, was held liable to shareholders under a standard negligence cause of action. (*See generally* Pl. Opp. 22-23).

26

To be clear, to say that corporations do not owe fiduciary duties to their stockholders "is not to say that a corporation owes no duty or can never be held liable under Delaware law if it promulgates false and misleading disclosures to its shareholders." *Buttonwood Tree Value Partners, L.P.*, 2014 WL 3954987, at *5 (quoting *In re Dataproducts Corp. S'holders Litig.*, Civ. Action No. 11164, 1991 WL 165301, at *7 (Del. Ch. Aug. 22, 1991)). Instead, it means that "any disclosure duty owed by the corporation to its shareholders must be predicated upon a theory of legal or equitable fraud." *Id.* (quoting *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301, at *7). Notably, "[a] claim for negligent misrepresentation is often referred to interchangeably as equitable fraud." *Fortis Advisors LLC* v. *Dialog Semiconductor PLC*, Civ. Action No. 9522-CB, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015).

Plaintiff's avenue of redress for challenging allegedly false statements of a corporation, when bringing an action against a corporation as opposed to its Board, is thus to seek a claim for negligent misrepresentation or equitable fraud. As the Court has already addressed, *see supra* B.3.b, Plaintiff's claim for negligent misrepresentation fails on multiple, independent grounds. However, the failure of Plaintiff to plead a viable claim for negligent misrepresentation does not change the Court's analysis regarding its claim for negligence. Accordingly, because Plaintiff fails to plausibly allege that Defendant owed a duty of care to either its former shareholders or to those who short its stock, its claim for negligence must be dismissed.

**CONCLUSION**

Based upon the foregoing analysis, the Court hereby GRANTS

Defendant's motion to dismiss the Amended Complaint in full.  The Clerk of

Court is directed to terminate all pending motions, terminate all remaining

dates, and close this case.

SO ORDERED.

Dated:     September 23, 2024
           New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge